UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN LEGRAND,** | : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:12-0743 |
| v. | : | (MANNION, D.J.) |
| **UNITED STATES OF AMERICA** | : | |
| Defendant. | : | |

## MEMORANDUM

The plaintiff, John Legrand ("Legrand"), brings this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, et seq., for injuries he received as a result of ingesting chicken infected with salmonella bacteria on June 25, 2011, while incarcerated at the United States Penitentiary - Canaan ("USP Canaan"), in Waymart, Pennsylvania. The defendant has exhausted his administrative remedies, and the court has jurisdiction under 28 U.S.C. §1346(b).

The defendant, the United States of America (the "Government"), admits liability, and the only issue for the court's determination is the damages to which the plaintiff is entitled. On August 10, 2016 the court conducted a non-jury trial. As a result of the trial and the evidence presented, pursuant to Fed. R. Civ. P. 52(a), the court makes the following findings of

fact and conclusions of law based on a preponderance of the evidence.

## FINDINGS OF FACT

1.     On June 25, 2011, plaintiff John Legrand was incarcerated at USP Canaan in Waymart, Pennsylvania. At the time, he was working for the binding department in UNICOR, the prison's manufacturing facility, overseeing quality assurance of the binding of pamphlets. He also regularly exercised.

2.     During the evening meal on June 25, 2011, the prison served fajitas containing chicken that was contaminated with salmonella bacteria. The plaintiff consumed two servings of the fajitas. That evening, after eating the chicken fajitas, the plaintiff became ill. He vomited and had diarrhea.

3.     The plaintiff's symptoms worsened in the immediate days thereafter. On June 26, 2011, the plaintiff suffered from the following: vomiting, diarrhea, abdominal cramps, bloating, chills, aches, eye irritation, and headaches. He involuntarily defecated in his pants multiple times, at least once in the presence of his cellmate, which he testified caused him embarrassment. He was seen by a medical professional, who prescribed for him Tylenol and anti-nausea medicine. The plaintiff was also given Gatorade for hydration. (Gov't Ex. B at 4).

4.      Many other inmates also contracted food poisoning by eating the tainted fajitas during the evening meal, including the plaintiff's cellmate. The plaintiff and his cellmate argued over the toilet since there was only one toilet in their cell.

5.      As a result of the salmonella outbreak, USP Canaan was placed on full lockdown from June 26, 2011 through June 30, 2011, during which inmates were not allowed out of their cells. On June 30, 2011, a modified lockdown was instituted, allowing inmates to move outside of their cells and into the unit common areas. On July 13, 2011, the institution returned to normal operation, and all lockdowns were released. Some units were released from any form of lock down before July 13, 2011, but not the plaintiff's unit.

6.      During the period of full lockdown lasting approximately four to five days, the plaintiff and his cellmate ran out of toilet paper because USP Canaan was not willing to unload vans containing supplies without inmate assistance. There is uncontroverted testimony that when the plaintiff and his cellmate exhausted their supply of toilet paper, they resorted to using their sheets and reusing the sheets after washing them with soap. When they ran out of soap, they resorted to washing their sheets with toothpaste. When their toothpaste ran out, they just used water. During this time period, USP

Canaan failed to provide the plaintiff and his cellmate with a resupply of toilet paper and soap, resulting in unsanitary conditions further exacerbated by the inmates' lack of access to showers.

7. The court reviewed the pertinent medical records and prison records of the plaintiff, which indicate the following:

    a) On a July 1, 2011, Health Services Clinical Encounter, or prison medical consultation, the plaintiff complained of a headache and was prescribed ibuprofen. (Gov't Ex. B at 5-7).

    b) On a July 21, 2011, Health Services Clinical Encounter, the plaintiff complained of a rash on his foot and was prescribed nystatin cream. He also complained of bloating. The provider noted that the plaintiff had internal hemorrhoids. (Gov't Ex. B at 8-9).

    c) On an August 4, 2011, Health Services Clinical Encounter, the plaintiff presented with multiple complaints. He complained of occasional diarrhea and bloating, and he stated that "when he eats he feels like the food sits in his stomach for hours." (Gov't Ex. B at 11). He also complained of itchy, watery eyes and pain during urination. The plaintiff's urine was tested for blood, resulting in a determination that there may have been a trace of

blood. The provider noted, "upon review of the test srtip [sic] I think that the blood reading should have registered as a trace instead of negative." (Id.). During the same encounter, the provider noted that the plaintiff did not have diarrhea or abdominal pain at that time. The provider requested a gastroenterology consultation for the plaintiff.

d) On August 7, 2011, the plaintiff filed a grievance letter stating that he was still experiencing symptoms of food poisoning from the salmonella infection, and that his request for a stool test was denied. (Pl's Ex. 15).

e) On an August 16, 2011, Health Services Clinical Encounter, the plaintiff complained of abdominal pain and said that he noticed blood in his urine. He also requested and was refused a stool test for salmonella. (Gov't Ex. B at 14).

f) On August 24, 2011, the plaintiff filed another grievance letter reporting the same troubles he reported in his August 7, 2011 letter. He stated that he was "still having some active symptoms of salmonella poison in my body, like, urinating blood with light burning pain, joint pain, bad headaches, stomach pain, some diarrhea, feeling like I want to vomit after consuming meals

and/or food and eye irritation." (Pl's Ex. 16). He also objected to the repeated denial of his request for a stool test.

g)   On August 31, 2011, the plaintiff had a gastroenterology consultation with an outside provider. The provider found that the plaintiff had gastroesophageal reflux disease ("GERD") and prescribed omeprazole for him. The provider also noted a provisional diagnosis of epigastric pain and diarrhea, and recommended an esophagogastroduodenoscopy ("EGD"), or upper gastrointestinal study, as well as a colonoscopy. (Gov't Ex. B at 16).

h)   Stool samples taken from the plaintiff on August 29, 2011, and August 30, 2011, tested positive for the presence of salmonella. (Pl's Exs. 3-4).

I)   On an October 27, 2011, Health Services Clinical Encounter with McDaniel Holloway, M.D., the plaintiff denied abdominal pains or any changes in bowel habits. The plaintiff also stated that "he was ill during the salmonella incident, however he is doing better now." (Gov't Ex. B at 20).

j)   On December 2, 2011, the plaintiff tested negative for the presence of salmonella, which the plaintiff testified brought him

some relief. (Gov't Ex. B at 28).

k) On November 7, 2012, the plaintiff had a colonoscopy. The results were normal, but the provider found that the plaintiff had internal hemorrhoids. (Pl's Ex. 8). The provider also recommended that the plaintiff undergo an upper gastrointestinal endoscopy to rule out the source of bleeding.

l) On January 11, 2013, the plaintiff was taken to the emergency room at Wayne Memorial Hospital due to abdominal pain. The plaintiff had a C.A.T. scan of his abdomen showing that he had kidney stones. (Gov't Ex. B at 31-39). He was also found to have constipation.

m) On August 13, 2014, the plaintiff had an abdominal ultrasound due to epigastric discomfort. The results were normal. (Gov't Ex. B at 49).

n) On two separate Health Services Clinical Encounters on April 24, 2015, and May 20, 2015, the plaintiff presented with epigastric pain and discomfort such that he had to sleep upright in a semi-seated position. (Gov't Ex. at 51-52). He also stated he felt as though food was shooting up through his throat.

o) On June 17, 2016, the plaintiff finally underwent an EGD at

7

Stonewall Jackson Memorial Hospital with findings of gastroesophagitis and a hiatal hernia. The plaintiff testified that the results somewhat put his mind at ease. (Gov't Ex. at 63).

8. The Government called Dr. Holloway as a witness. Dr. Holloway is a retired physician who specialized in emergency medicine. He was the medical officer at USP-Canaan at the time of the salmonella outbreak.

9. Dr. Holloway testified that the length of symptoms from a salmonella infection vary from person to person. People can possess symptoms for a week, several weeks, or several months. Dr. Holloway also testified that although the plaintiff tested positive for salmonella at the end of August, the plaintiff was not necessarily symptomatic. Salmonella bacteria sheds through the stool, so the test may simply have indicated this shedding. Dr. Holloway further testified that it may take weeks or months for a person's system to fully clear of salmonella bacteria, and yet the person may be asymptomatic.

10. Dr. Holloway testified that the general symptoms of a salmonella infection include: abdominal cramps, nausea, fever, diarrhea, and generalized malaise. He said that it does not cause GERD or joint pain, but it possibly gives eye irritation. He also said that diarrhea does not necessarily lead to hemorrhoids.

11. The pertinent medical records indicate that the plaintiff was diagnosed with GERD, which Dr. Holloway testified affects the upper digestive tract and the esophagus. Treatment involves decreasing acid in the stomach to prevent reflux back into the esophagus. Further, Dr. Holloway testified that "epigastric" refers to the upper digestive tract, which is where the plaintiff continued to experience pain.

12. The plaintiff testified that, as late as July 21, 2011, he was still vomiting and had diarrhea, requiring him to relieve himself every half hour. He also stated that he still suffered symptoms at the beginning of August, albeit less frequently. By the end of October, his symptoms had cleared up except for the bloating.

13. The credibility of the plaintiff's testimony is contradicted by other evidence. After the prison lifted the full lockdown on June 30, 2011, the plaintiff resumed working at UNICOR without interruption, for six and a half hours a day for up to six days a week, leading the court to conclude that his symptoms were not as severe as alleged.

14. Other inconsistencies weaken the plaintiff's testimony. The plaintiff testified that, prior to becoming ill, he weighed approximately 257 pounds, and that he lost an immense amount of weight due to his sickness from food poisoning. The medical records from the Bureau of Prisons

indicate that on May 26, 2011, the plaintiff weighed 229 pounds. (Gov't Ex. B at 1). On August 16, 2011, he weighed 231 pounds ( Id. at 14). On October 27, 2011, he weighed 226 pounds. (Id. at 1). The evidence shows that the plaintiff's weight marginally fluctuated, and that during the period when his symptoms were allegedly at their height, he actually gained weight between May and August 2011.

15.   The plaintiff also testified that he was on full lookdown and was not allowed out of his cell for two to three weeks when the parties stipulated that the period of full lookdown lasted several days, from June 26 through June 30, 2011.

16.   The plaintiff called Kevin Spotts ("Spotts") as a witness to testify as to the plaintiff's diminished state after he contracted food poisoning. Spotts resided in the cell next door to the plaintiff and worked out with the plaintiff. The court gives some weight to Spotts' testimony that the plaintiff was affected by the salmonella infection physically and emotionally. For example, Spotts testified that the plaintiff could not work out as vigorously and instead of running four laps, the plaintiff could only run half a lap and walk another half a lap. Spotts also testified that before June 25, 2011, the plaintiff smiled and joked a lot, whereas after, he appeared depressed. Spotts also observed that the plaintiff suffered symptoms, including diarrhea

10

and vomiting, for at least three weeks to one month.

17. However, Spotts' testimony is to be given only limited weight. Spotts testified that the plaintiff appeared to have lost fifteen to twenty pounds, which is unsupported by the record. Spotts also testified that he and the plaintiff had been working out for approximately six months before the incident, but the plaintiff arrived at USP Canaan less than two months beforehand.

18. At closing, plaintiff's counsel argued that the plaintiff was still afflicted with symptoms from food poisoning through the end of August, and by the end of October, his symptoms generally cleared. The defendant argued that the plaintiff was very ill for one week and had occasional diarrhea and minimal symptoms for one to three weeks thereafter. The defendant further argued that most of the problems that plaintiff experienced after July were unrelated to the salmonella food poisoning and related to his GERD. The court finds that the plaintiff suffered symptoms from the salmonella infection for a period of approximately 2-3 weeks from consumption, decreasing steadily over time.

19. The court finds that the plaintiff has failed to establish by a preponderance of evidence that the source of his reported problems after this time period was the salmonella infection. The plaintiff testified that he

experienced epigastric pain and diarrhea at the end of August. As Dr. Holloway stated, epigastric pain refers to the upper digestive track, which is generally unaffected by a salmonella infection. The plaintiff was diagnosed with GERD and a hiatal hernia, which causes many of the digestive problems that the plaintiff described, such as the feeling of food shooting up through his throat. During cross-examination, the plaintiff admitted that he experienced migraines prior to the incident. He also acknowledged that he was diagnosed with kidney stones, which may have caused the burning sensation during urination. In addition, the plaintiff was found to have constipation, which Dr. Holloway testified can lead to internal hemorrhoids, which can then cause bleeding.

20.  Finally, the plaintiff claims that, over the ensuing months and years, he was concerned and distressed that the salmonella had caused an injury to his digestive system resulting in ongoing abdominal problems and acid reflux. The plaintiff made repeated requests that the EGD be carried out, and the record reflects that he had to wait five years to receive the testing, after which he discovered that the source of many of his digestive problems was a hiatal hernia. The plaintiff maintains that he should be compensated for the emotional distress during this period.

21.  While the Bureau of Prisons inexcusably delayed administering

the plaintiff's EGD for years, the plaintiff is not entitled to damages for emotional distress over a physical condition that was not caused by the defendant. The plaintiff experienced acid reflux, and as Dr. Holloway testified, food poisoning from salmonella does not cause GERD. Moreover, GERD affects the upper intestinal tract, and salmonella bacteria generally resides in the lower intestinal tract.

22. As a result of the negligent service of the chicken fajitas contaminated with the salmonella bacteria and the plaintiff's consumption of it, the plaintiff suffered pain, mental distress, embarrassment, humiliation and the loss of the enjoyment of life in varying degrees spanning 2-3 weeks from June 25, 2011.

23. The Government's negligence was the factual cause of the plaintiff's injuries.

24. Legrand suffered damages in the amount of $2,500.00.

## CONCLUSIONS OF LAW

1. Under the Federal Tort claims Act, the district court should apply the "law of the place where the act or omission occurred." 28 U.S.C. §1346(b).

2. Accordingly, since the act or omission occurred in Waymart, Pennsylvania, the Court applies the law of Pennsylvania.

3.    The Government has admitted liability.

4.    The damages are non-economic and include pain and suffering, embarrassment and humiliation, and the loss of the ability to enjoy the pleasures of life. McManamon v. Washko, 906 A.2d 1259, 1281-82 (Pa. Super. 2006); see also Pa. R. Civ. P. 223.3.

5.    The plaintiff has proven his damages by a preponderance of the evidence.

6.    Judgment will be entered in favor of the plaintiff and against the United States of America in the amount of $2,500.00.

An appropriate order shall follow.


       s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: September 6, 2016**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-0743-01.wpd